ke Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8175 | **DATE** | 10/27/2004 |
| **CASE TITLE** | Powell vs. Paterno Imports | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, defendant's motion for summary judgment is granted. Enter Memorandum Opinion and Order. Pretrial conference set for 11/18/04 and jury trial set for 12/6/04 are vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | OCT 28 2004 | |
| | Notified counsel by telephone. | | date docketed | 18 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 2004 OCT 27 PM 2:47 | | |
| MF | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| CHARLES POWELL, | ) |
| --- | --- |
| Plaintiff, | ) |
|  | ) |
|  | ) No. 03 C 8175 |
| v. | ) |
|  | ) Judge John W. Darrah |
| PATERNO IMPORTS, LTD., | ) |
| d/b/a PATERNO WINES INTERNATIONAL, | ) |
|  | ) |
| Defendant. | ) |

DOCKETED
OCT 28 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, Charles Powell, filed suit against Defendant, Paterno Imports, Ltd., alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-631, and failure to provide him notice of his COBRA rights under the Employment Retirement Income Security Act, 29 U.S.C. §§ 1161-1168. Presently before the Court is Defendant's Motion for Summary Judgment.

### BACKGROUND

Paterno is in the business of selling luxury wines to wine distributors. The distributors then sell these wines to retailers. (Def.'s 56.1(a)(3) Statement ¶ 10). The Santa Margherita brand of Italian wine is Paterno's most important brand because it generates the most revenue for the company. (Id., ¶ 11).

Powell has worked as a brand manager or its equivalent for several different employers throughout his career. (Def.'s 56.1(a)(3) Statement ¶ 14). From 1972 to 1982, Powell worked for Joseph Schlitz Brewery Company as the Brand Development Manager for the Old Milwaukee brand. (Id., ¶ 15). In 1982, Schlitz was purchased by Stroh's Brewery Company. Powell worked for Stroh's from 1982 to 1991, first as brand manager and then as a director.

(Id., 16). In January of 1991, Powell terminated his employment with Stroh's after Stroh's offered him the opportunity to exercise his rights under a change of control provision in his employment agreement. (Id., ¶ 17).

In June 1991, Powell began working for G. Heileman Brewery Company as its Vice President of Marketing. In this position, Powell supervised two to three brand managers. (Def.'s 56.1(a)(3) Statement ¶ 18). In early 1995, Powell terminated his employment with Heileman after Heileman offered him the opportunity to exercise his rights under a change of control provision in his employment agreement. (Id., ¶ 19).

In September 1995, Powell began working for Dairy Management, Inc. as Vice President of Marketing. In this position, Powell supervised five brand managers. (Def.'s 56.1(a)(3) Statement ¶ 20). Powell's employment with Dairy was terminated, effective August 13, 1999, following the consolidation of Dairy with another milk organization. (Id., ¶ 21; Plaint.'s 56.b)(3) Statement ¶ 3). Powell's personnel file from Dairy includes documentation reflecting that his supervisor was dissatisfied with his job performance in the months leading up to his termination. (Def.'s 56.1(a)(3) Statement ¶ 22). In one document, Powell's supervisor noted that Powell's position may be in jeopardy because she "had to make numerous edits [to his work] because of gross inaccuracies"; and when he was questioned about this, "he out and out lied to [her]." (Id., ¶ 23).

In June 2000, Powell telephoned Greg Christoff, Paterno's Vice President of Marketing, having been referred to Christoff by another of Paterno's brand managers. (Def.'s 56.1(a)(3) Statement ¶ 27). In July 2000, Christoff and Powell met to discuss Paterno's wine business and employment opportunities that might be available in the future, although no specific job was

discussed at this meeting. (Id., ¶ 28). Christoff and Powell met again in September 2000; again, no specific job was discussed. (Id., ¶ 29). At this meeting, Christoff wondered if a person with Powell's "senior level" of experience would be satisfied with a marketing position at Paterno. (Plaint.'s 56.1(b)(3) Statement ¶ 8).

When the brand manager position for the Santa Margherita brand became available, Christoff asked Kim Hack, Paterno's then-Executive Director of Marketing, to interview Powell for the position. (Def.'s 56.1(a)(3) Statement ¶ 30). Hack reported to Christoff at the time of the interview. (Id., ¶ 31). During the interview, Powell recalls Hack asking Powell, "Why would an old guy like you want to join a company like this?" Hack does not recall making such a statement. (Plaint.'s 56.1(b)(3) Statement ¶ 8; Def.'s Response ¶ 8). Following the interview, Hack did not recommend hiring Powell because Hack felt that Powell's answers to her questions about business issues lacked the insight and thoughtfulness that she would have expected from someone with Powell's level of experience. (Def.'s 56.1(a)(3) Statement ¶ 32). Notwithstanding the concerns of Hack, Christoff recommended hiring Powell as a brand manager because he thought that Powell's background and experience would work well for the Santa Margherita brand. (Id., ¶ 33).

In January 2001, Powell was offered the position of brand manager for the Santa Margherita brand. (Def's 56.1(b)(3) Statement ¶ 37). The duties of a brand manager typically consist of developing and executing the annual business plan for the brand, including identifying long-term strategies for increasing brand profitability, developing and managing the positioning

of the brand, and maintaining contact with Paterno's suppliers. (Id., ¶ 51). At the time of his hire, Powell was 54 years old. (Id., ¶ 38). At the time that Christoff recommended hiring Powell, Christoff was 46 years old. (Id., ¶ 39).

At the time Powell was hired, Powell reported to Todd Griffith, Paterno's Director of Marketing. (Def.'s 56.1(a)(3) Statement ¶¶ 36, 52). In April 2002, Griffith scheduled a meeting with Powell to discuss his job performance. (Id., ¶ 53). Prior to the meeting, Griffith prepared a document outlining the performance issues he intended to discuss with Powell during his review. Among other problems, Griffith observed that Powell "needs to improve on command of details, numbers, and documentation" and had "not yet moved to be the champion of [his] brands rather than the caretaker." (Id., ¶ 54). Griffith also had concerns because Powell's work product contained fundamental mistakes, including spelling errors; but when questioned about these mistakes, Powell blamed the mistakes on others. (Id., ¶ 55). For one project in particular – the development of marketing materials for Ca' Del Bosco – Griffith discerned that Powell's work product failed to capture the essence of the brand in order to differentiate it from other brands and that the project ran behind schedule and was mismanaged. (Id., ¶ 56).

Hack also observed that Powell lacked a sense of urgency, had problems managing his work flow, and did not clearly understand how various forecasting models worked. She found Powell's marketing plans were rudimentary and required significant rewrites before they could be presented. The marketing plans also did not represent a strategic understanding of the business or where it needed to go. (Def.'s 56.1(a)(3) Statement ¶ 57). Hack also had concerns about Powell's lack of urgency with respect to processing invoices and following up with vendors. (Id., ¶ 58).

4

Email correspondence between Powell and various individuals, including the President of Paterno, documents a number of instances in which Powell did not follow up on the tasks or projects assigned to him. (Def.'s 561.(a)(3) Statement ¶ 64). For example, in one email message, Kelly Johns posed a question to Powell on July 12, 2002, and was still awaiting an answer two months later. (Id., ¶ 65). In a July 19, 2002 email, Patrick Pokorny wrote to Powell, "It has been 7 months since I put in the request for these [Ritz certificates] with a number of follow ups on this. Please let me know what the hold up is so we can get these awards sent out." As of August 8, 2002, Powell had not responded to Pokorny's email. (Id., ¶ 66). On February 18, 2003, Bill Terlato, President of Paterno, sent an email to Powell asking, "Where do we stand with this [Santa Margherita Pinot Bianco label]? This has been hanging out there since November. What is so difficult about getting a label with some minor and simple changes. I do not want to have to keep asking about this repeatedly." (Id., ¶ 67). Powell indicates that the delay in the labeling was due to his discovery that an incorrect label was being used. (Plaint.'s 56.1(b)(3) Statement ¶ 19).

In the Fall of 2002, Griffith transferred to a new position within Paterno. (Def.'s 56.1(a)(3) Statement ¶ 70). At this time, Christoff believed that he supervised Powell. (Id., ¶ 71). However, Powell believed that he still reported to Griffith. (Id., ¶ 72). During this time, Christoff and Powell met several times and had opportunities to observe Powell's performance. (Id., ¶ 73). In October, 2002, Christoff met with Powell and expressed concern regarding Powell's approach to the job and that what Christoff saw of Powell's work did not match the interview he originally had with Powell. (Id., ¶ 74).

During this same time, Christoff observed that Powell's job performance was lacking in three core areas – quality, insight, and leadership. (Def.'s 56.1(a)(3) Statement ¶ 75). Christoff perceived that Powell did not effectively lead the Santa Margherita brand and was not willing to accept responsibility for a mistake made by his team. (Id., ¶ 77).

In November 2002, Christoff, Hack, Powell, and other Paterno personnel met with representatives of one of Paterno's advertising agencies to discuss advertising for the Santa Margherita brand. (Def.'s 56.1(a)(3) Statement ¶ 84). Shortly after the meeting, a principal of the advertising agency related to Christoff that she was concerned about Powell's apparent lack of understanding of the business. (Id., ¶ 87).

On February 3, 2003, Paterno hired Greg Warwick as its new Director of Marketing. (Def.'s 56.1(a)(3) Statement ¶ 80). After Warwick was hired, Christoff told Warwick that he had concerns regarding Powell's job performance and requested that Warwick observe Powell and then report back to Christoff as to whether or not he shared the same concerns. (Id., ¶ 81). In March 2003, Warwick reported to Christoff that he shared Christoff's concerns. (Id., ¶ 82).

Although the revenue figures for Santa Margherita were consistent during Powell's employment, given his concerns regarding the quality of Powell's work, Christoff believed it was too risky to retain Powell as the brand manager for Paterno's most important brand. (Def.'s 56.1(a)(3) Statement ¶ 90). Therefore, Christoff decided to terminate Powell's employment. (Id., ¶ 91).

On April 9, 2003, Christoff inadvertently sent an email outlining the severance package Paterno intended to offer Powell directly to Powell, rather than its intended recipient, Diana Quinn, Paterno's Director of Human Resources. (Def.'s 56.1(a)(3) Statement ¶ 92). After

receiving the email, Powell met with Christoff and Quinn. At this meeting, Christoff officially notified Powell that his employment was being terminated. (Id., ¶ 93). At the time of Powell's termination, he was 56 years old, and Christoff was 48 years old. (Id., ¶ 95). The day after he was terminated, Powell met with Quinn, who advised Powell that his health insurance coverage would end the next day. (Plaint.'s 56.1(b)(3) Statement ¶ 23).

Paterno did not immediately fill the position vacated by Powell. (Def.'s 56.1(a)(3) Statement ¶ 98). Ultimately, Paterno decided to reassign the majority of Powell's brands to one of its other brand managers, Laura Smith, age 39, rather than hire a new brand manager. (Id., ¶ 99).

Following his termination, Paterno and Powell engaged in negotiations over a severance package through mid-July 2003. (Def.'s 56.1(a)(3) Statement ¶ 101). During the negotiations, Powell remained covered by Paterno's health insurance carrier. (Id., ¶ 102). On August 11, 2003, Paterno notified its third-party administrator for its health plan, International Products Group/Group Administrators Ltd. ("Group Administrators"), that Powell had been terminated. (Id., ¶ 103).

Group Administrators subsequently sent COBRA election forms to Powell's home address via certified mail. (Def.'s 56.1(a)(3) Statement ¶ 104). Powell was notified by the postal service three times that he had certified mail at the post office. (Id., ¶ 105). Powell did not retrieve the certified mail at the post office because he did not recognize the name of the sender. (Id., ¶ 106). Powell did receive a letter from Group Administrators, Ltd., dated

October 13, 2003, indicating that his health benefits would not commence. (Plaint.'s 56.1(b)(3) Statement ¶ 26). Prior to October 13, 2003, Powell took coverage under his wife's health insurance plan. (Def.'d 56.1(a)(3) Statement ¶ 107).

During his employment with Paterno, Powell was subjected to numerous comments relating to his age. These comments included: Griffith's telling Powell that Griffith hoped Powell would not grow a goatee because he would "look ugly and old" with a goatee; Hack's asking Powell who the best presidential speaker was "in [his] day"; Hack commented that Powell was married for a long period of time and asked how old Powell was when he got married; and Griffith's telling Powell that he did not look a day over 75 on one of Powell's birthdays. (Plaint.'s 56.1(b)(3) Statement ¶ 11). Powell was also required to work with two administrative assistants who had difficulty assisting him. (Id., ¶ 20).

For the fiscal year that Powell was terminated, Powell's plan for the Santa Margherita brand was to achieve a "brand contribution" of $20,366,940. In fiscal year 2003, Santa Margherita achieved a brand contribution of $22,433,279. The actual profit thus exceeded the goal by 10.1%. (Plaint.'s 56.1(b)(3) Statement ¶ 15). Other, younger, brand managers that did not reach their plan goal were not terminated. (Id., ¶ 17).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family*

*Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

A party opposing a motion for summary judgment must file a concise response to the movant's statements of material fact, including a response to each numbered statement. In the case of any disagreement, the opposing party must site specific references to the affidavits, parts of the record, and other supporting materials relied upon by the opposing party. The opposing party may also include statements of additional material facts that rebut the moving party's motion. These additional facts must also include references to affidavits, parts of the record, and other supporting materials that support such additional material facts. L.R. 56.1(b)(3).

*AGE DISCRIMINATION CLAIM*

A plaintiff alleging age discrimination can avoid summary judgment using either the "direct method" or "indirect method." *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004) (*Gusewelle*). Under the direct method of proof, a plaintiff may show, either by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by the impermissible purpose of age. Direct evidence is evidence that, if believed by the fact-finder, would prove discriminatory conduct by the employer without reliance on inference or presumption. Circumstantial evidence is evidence sufficient to create a convincing mosaic that allows a fact-finder to infer intentional discrimination by the decision-maker. *See Gusewelle*, 374 F.3d at 574. Such circumstantial evidence must point directly to a

discriminatory reason for the employer's action." *Adams v. Wal-Mart Store, Inc.*, 324 F.3d 935, 939 (7th Cir. 2004).

Under the indirect method of proof, from the familiar *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. To do this, a plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) a similarly situated employee not in the protected class was treated more favorably. *See Steinhauer v. Degolier*, 359 F.3d 481, 484 (7th Cir. 2004) (*Steinhauer*). If the plaintiff meets this burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant can do so, the burden shifts back to the plaintiff to show that the defendant's proffered reason for its actions is a pretext for discrimination. *See Steinhauer*, 359 F.3d at 484. For summary judgment purposes, the plaintiff must only produce evidence from which a rational fact-finder could infer that the defendant lied about its proffered reasons for its actions. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994).

Plaintiff argues that he has presented sufficient direct evidence of age discrimination through the ageist comments of Hack and Griffith.

Generally, statements by non-decision-makers do not satisfy a plaintiff's burden of creating a *prima facie* case of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989). However, summary judgment is generally improper if the plaintiff can demonstrate that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action. *See Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994). These statements must be made contemporaneously to the adverse

employment action and must not rely on inference or presumption to demonstrate discriminatory inference; and mere speculation as to the thoughts of the decision-maker are irrelevant to the inquiry of discrimination. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062 (7th Cir. 2003); *Markel v. Board of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002) (statements which required inference of discriminatory animus and that were made two months prior to the adverse employment insufficient to demonstrate direct discrimination).

Plaintiff cites to several statements made by Griffith and Hack that Plaintiff contends demonstrate discriminatory animus. Furthermore, because Hack and Griffith both reported to Christoff, their discriminatory animus was known by Christoff and affected Christoff's decision to terminate Powell's employment. However, the alleged statements by Griffith and Hack were not made contemporaneously with Christoff's decision to terminate Powell, one of which was allegedly made before Powell was even hired; and the statements clearly rely on inference or presumption to demonstrate a discriminatory inference. Furthermore, Plaintiff fails to provide any evidence that any of the statements affected Christoff's decision to terminate Powell's employment. Instead, Plaintiff merely speculates that the stale stray remarks influenced Christoff's employment decision. Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact exists as to direct evidence of age discrimination.

Plaintiff also argues that he has met his burden under the indirect method of proof. Defendant argues that plaintiff failed to identify any similarly situated employees who were treated more favorably, and he failed to demonstrate that Defendant's proffered reasons for termination were a pretext for age discrimination.

A plaintiff demonstrates that another employee is "similarly situated" to him by "show[ing] that there is someone who is directly comparable to her in all material aspects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A court must look at all relevant factors, the number of which depends on the specific case, when making this determination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Plaintiff argues that younger brand managers who had missed their plan goals were not terminated. However, Plaintiff's employment was not terminated because he had missed his plan goals. Plaintiff met or exceeded his plan goals. Christoff's decision to terminate Plaintiff's employment was not due to meeting or not meeting plan goals but was based on Christoff's belief that Plaintiff's job performance was lacking in quality, insight, and leadership. Furthermore, Christoff testified at his deposition that the brand managers cited to by Plaintiff did not meet their goal plans due to reasons other than poor job performance, *i.e.,* discontinuance of a brand during the plan year and changing the plan and cutting back on sales. Plaintiff fails to identify any performance problems with the younger brand managers who did not meet their plan goals.

Plaintiff also argues that directors and Christoff, as a vice-president, engaged in conduct that was detrimental to Paterno without penalty. However, these employees are not similarly situated to Plaintiff, a brand manager.

Defendant also argues that even if Plaintiff could establish a *prima facie* case of discrimination, he has not established that Paterno's reasons for his termination were a pretext for age discrimination.

A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

Plaintiff argues that the direct evidence of discrimination in Hack's and Griffith's comments regarding Plaintiff's age permits a jury to infer an improper motive of age discrimination. However, these comments were not made by the decision-maker, Christoff, and fail to establish a genuine issue of material fact as to whether Christoff's cited reasons for Plaintiff's termination were a lie or phony.

Plaintiff also argues that pretext can be inferred because Defendant reassigned Plaintiff's brands to a younger brand manager, who did not meet some of her plan goals, and failed to terminate other younger brand managers whose did not meet their plan goals. The reassignment of Plaintiff's brands to a younger brand manager whose brands performed badly and the failure to terminate other younger brand managers for failing to meet their plan goals fail to establish a genuine issue of material fact as to whether Christoff's reasons for Plaintiff's termination was pretextual. The failure of brand managers' meeting their plan goals was not a factor in Plaintiff's termination.

Lastly, as to pretext, Plaintiff argues that Christoff's contradictory reasons for his termination establish pretext. However, Plaintiff has failed to demonstrate that Christoff's stated

13

reasons for his termination were contradictory to other statements made by Christoff. Plaintiff relies upon his assertion that Christoff was untruthful when he stated he made the decision to terminate Plaintiff in April 2003 because a computer analysis of Plaintiff's severance documents indicates a creation date in February 2003. However, Quinn, the author of the document, avers that the electronic version of the document reflects an earlier creation date because the underlying template that was used for the Plaintiff's document was created earlier.

Based on the above, Plaintiff has failed to demonstrate genuine issues of material fact exist as to Plaintiff's age discrimination claim.

## FAILURE TO GIVE COBRA NOTICE CLAIM

Lastly, Defendant argues that Plaintiff has failed to establish a genuine issue of material fact to defeat summary judgment on Plaintiff's COBRA claim.

COBRA requires group health plan sponsors to provide notice to each qualified beneficiary who, as the result of a qualifying event, such as termination, would lose coverage to elect to continue coverage. 29 U.S.C. § 1161. "Notification methods that are reasonably calculated to reach the former employee satisfy the standard good faith compliance with the statute." *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 978 (N.D. Ill. 1998) (*Keegan*). The issue is not whether the former employee actually received the notice but whether the notice was sent in a good faith manner reasonably calculated to reach the former employee. *See Keegan*, 992 F. Supp. at 978. An employer's obligation is satisfied by sending the required notice by first class mail, including certified mail. *See Keegan*, 992 F. Supp. at 978; *Smith v. AT&T Broadband Network Solutions, Inc.*, 2002 WL 370217 (N.D. Ill. March 8, 2002); *Degruise v. Sprint Corp.*,

279 F.3d 333, 337 (5th Cir. 2002); *Holmes v. Scarlet Oaks Retirement Comm.*, 277 F. Supp. 2d 829, 834 (S.D. Ohio 2003).

Here, it is undisputed that Plaintiff's COBRA notice was sent via certified mail to Plaintiff's last known address and that Plaintiff was informed several times by the Post Office of this pending mail. Plaintiff chose not to retrieve the letter. Furthermore, the law does not impose any obligation on the part of the employer to ensure that the notice is forwarded in an envelope with a return address familiar to the employee. *See* 29 U.S.C. § 1161-1168. Accordingly, summary judgment is granted on Plaintiff's COBRA claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

Dated: October 27, 2004

JOHN W. DARRAH
United States District Judge